# CASES

## DECIDED IN THE

# COURT OF APPEALS OF GEORGIA

### AT THE

## MARCH TERM, 1908.

---

### 727. FLOYD COUNTY v. MILLER.

It is the duty of a coroner to hold an inquest when it is apparent from the body of the deceased that he came to his death by violence, unless it be known by whose hands death was occasioned; and this rule should not be relaxed in a case where a citizen is killed by a mob.

Certiorari, from Floyd superior court—Judge Wright. June 7, 1907.

Argued December 10, 1907.—Decided March 16, 1908.

*J. F. Hillyer,* for plaintiff in error.   *G. E. Maddox,* contra.

RUSSELL, J. In this case Floyd County declined to pay the coroner for holding an inquest. The coroner brought suit for his fee, and the jury in the justice's court rendered a verdict in his favor, which, upon certiorari, was upheld by the judge of the superior court; and the county now excepts to the judgment holding it liable.

The testimony shows that two policemen of Rome, in response to a call for their services, went to the residence of one of the citizens of that city and attempted to arrest the deceased. The evidence does not disclose what offense, if any, the deceased had committed. Neither officer had any warrant for the arrest of the alleged culprit, nor was the offense committed in their presence. The accused, whatever he had done, if anything, resisted arrest, as under the law he had a right to do, and, in the mêlée that ensued, shot a bystander and retreated into an outhouse, where he

1                                  1

was killed by a mob. His body was found inside of the door of the house, and it was evident that his death had been caused by shots. His revolver lay beside him and bore evidence of having been discharged but once. It appears from the evidence that a large crowd was present and shots were fired into the house from almost every direction; and the specific point made is that there was no need for an inquest by the coroner, because there were many witnesses to the killing; in other words, that the coroner was not authorized to hold any inquest, nor entitled to any fee for holding an inquest, because of the large number of people who saw the firing of the shots, from one of which death resulted. The record does not disclose what was the result of the inquest, or whether it resulted in the ascertainment of who fired the fatal shot; but the testimony in the justice's court, we think, unequivocally demonstrates that the coroner did right in holding the inquest, and is entitled to recover his fee for his services.

Guice, one of the policemen who was summoned, testified that the negro was shot by some one of the crowd; and this disposed of the presumption, if any such there be, insisted upon by the learned counsel for the county, that the deceased was killed by one of the officers. We waive any discussion of the right of the officers to kill the deceased because he had refused to submit to an arrest without a warrant; for the only testimony before 'the justice's court was that of Mr. Guice, who said that the deceased was shot by somebody in the crowd around the house. According to the testimony, nearly five hundred people surrounded the house. The evidence does not disclose how many were shooting, but certain it is (in the absence of any evidence that such a one had been summoned as part of the officers' posse) that if one of the crowd killed the negro, he was guilty of murder; and if the person was unknown, it was the duty of the coroner to set in motion the machinery of the law to ascertain the murderer. The fact that a large number of persons are present at the commission of a crime does not necessarily imply that there are witnesses present. There may be no witnesses present; because all who are present may be jointly criminal in the perpetration of an offense. To hold that because a large number of persons are present, who might be witnesses, this will preclude the holding of a coroner's inquest, would be to say that no coroner's inquest should be held where a citizen

meets death at the hands of a mob.  Certainly the legislature never intended the law to be thus construed.

We are well aware that the policy of curtailing expenses and of preventing useless inquests was manifested by the passage of the act of 1893 (Acts of 1893, p. 116) which superseded §589 of the Code of 1882, and that the opinion was expressed by Judge Lumpkin, in *Meads* v. *Dougherty County,* 98 *Ga.* 699 (25 S. E. 915), that "some of the coroners of this State are overzealous in the matter of holding inquests." The facts in the *Meads* case, however, bear no parallel to those in the instant case.  In the *Meads* case the few bleached bones that had been washed upon the banks of the creek were held not to constitute a dead body; and very naturally the opinion was expressed that it was not apparent from these bones that violence had caused the death.  All that was said, however, in the *Meads* case was mere obiter dicta; because the coroner's fee for holding the inquest was not before the court, the only point made in the bill of exceptions then being that the coroner was not entitled to the fee of $15 for expense incurred in burying the body, because it appeared that the bones were interred in a soap-box without expense to any one.  The present case is covered squarely by the third division of §1255 of the Penal Code. "Coroners shall take inquest over dead bodies in their respective counties as follows:  .  .  3d.  Of all dead bodies found, whether of persons known or unknown, when it is apparent from the body that violence caused the death."  It was apparent from the body of this deceased that he had been shot to death. Under our construction of the code section, nothing more is necessary than this to place upon the coroner the duty of holding an inquest, where no witnesses are known.  The statement that the grand jury can investigate the case would be no excuse for the non-performance of this duty on the part of the coroner; because that is true as to the commission of every crime.  The office of coroner is useless if it be not to collect evidence while all the details of the act are fresh in the minds of the witnesses, before the witnesses disappear, and before the offender has opportunity to make good his escape. And if no crime has been committed, the inquest may develop that fact and thus save further trouble and obviate future expense.

In carrying out the provisions of §1255, the coroner must act within the limits of a sound discretion; and he is presumed to do

so, until the contrary appears. And under the evidence in this case, the judge of the superior court could properly have overruled the certiorari upon this ground; because, in the state of the evidence introduced in the trial in the justice's court, there was nothing to rebut the presumption that this officer had acted in good faith and on sufficient cause. Clark County v. Calloway, 52 Ark. 361 (12 S. W. 56); Boislinere v. County Comm'rs, 32 Mo. 375. But in our opinion his decision rested upon even higher grounds. It is plainly apparent that it was the duty of the coroner to act. "The object of a coroner is to seek information and to obtain and secure evidence in case of death by violence or other unlawful means; and if there is reasonable ground to suspect that it was so caused, it becomes the duty of the coroner to act, especially when he has abundant cause to believe that death was the result of violence or that the deceased was feloniously destroyed." 9 Cyc. 985, and cit. "It is the duty of the coroner to hold an inquest over the body of a deceased person upon the receipt of information of the circumstances of his death which indicate that some one might be criminally liable; for, the killing being known, the presumption is that the slayer is guilty of a crime." Jefferson County v. Cook, 65 Ark. 557 (47 S. W. 562). A coroner should not be deterred from the performance of his duty because of the difficulty of its performance.

*Judgment affirmed.*